# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 18, 2010 Session

## STATE OF TENNESSEE v. ROBIN BLASKIS

**Appeal from the Criminal Court for Putnam County**
**No. 06-0867    Leon Burns, Judge**

_____

**No. M2009-01154-CCA-R3-CD - Filed December 8, 2010**

_____

In November 2006, the Putnam County grand jury indicted Appellant, Robin Blaskis, for one count of theft over $60,000. Following a jury trial, Appellant was convicted as charged. The trial court sentenced Appellant to ten years as a Range I, standard offender. On appeal, Appellant argues that the trial court erred in denying her motion to dismiss based upon the violation of her right to a speedy trial and that the evidence was insufficient to support her conviction. After a thorough review of the record, we conclude that the trial court's denial of her motion to dismiss was correct because the four factors set out in *Barker v. Wingo*, 407 U.S. 514 (1972), did not weigh in her favor. We also conclude that the evidence was sufficient to support her conviction. Therefore, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., JOINED.

Samuel J. Harris, Cookeville, Tennessee, for the appellant, Robin Blaskis.

Robert E. Cooper, Jr., Attorney General and Reporter, Lacy Wilber, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General, and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

Alan Tatum, the victim, was a pharmacist in Putnam County. He owned two pharmacies, Payless Family Pharmacy and Cookeville MedPlus Pharmacy. Appellant was Mr. Tatum's accountant and also a personal friend. Because Appellant had completed Mr.

Tatum's personal tax returns, he hired her as the accountant for the business when he opened his first pharmacy in 1993. Appellant's work for Mr. Tatum was without problems from 1993 until 2004.

In 2003, Mr. Tatum could not keep up with the paper work required for his business. He asked Appellant to process the payrolls for both of his pharmacies. There were about twenty hourly employees and a pharmacist on salary. Appellant walked Mr. Tatum through the process and told him that she had a system of checks and balances in place. Mr. Tatum sent the payroll information to Appellant's office on a weekly basis. Appellant would transfer funds electronically out of Mr. Tatum's business checking account for each pharmacy's payroll and place it in Appellant's escrow account. The checks to Mr. Tatum's employees would be paid out of Appellant's escrow account.

This payroll process began in January 2004. Mr. Tatum's bank called in late January 2004 and informed him that he had an overdraft. Mr. Tatum was shocked. He knew that the pharmacies were doing $8 million dollars in business. At this time, Appellant was receiving Mr. Tatum's bank statements. He would not see them until two months later. He spoke with Appellant at least three times about his concerns over cash flow issues. Appellant gave him different excuses for the cash flow issues in his account. At one point, Mr. Tatum noticed that the monthly payroll report seemed a little high, but it was not so much higher that it caused concern. Also, he noticed there were several small transfers of funds every month but some of those were to pay taxes.

In 2004, Mr. Tatum went at least twice a month to Appellant's office, and each time she told him that she was the only one handling his account. By November 2004, Mr. Tatum became concerned enough to enroll in online banking. As he monitored the activity in his account online, he began to see that money was going out of his account to unknown places. Initially, he believed that the bank had been making mistakes. He asked the bank to track where the money was going, and the bank told him it was going into Appellant's escrow account. Mr. Tatum blocked his accounts from Appellant so that money could not be moved from his account to her escrow account.

Mr. Tatum confronted Appellant. She became nervous and said she would find out what was happening. She told him that she would make it right and that she had insurance. However, she later informed him that she did not have insurance. Mr. Tatum demanded his files, records, and checks. He told Appellant that she was no longer going to process his payroll. Appellant returned his checks and a computer disc containing payroll information. Appellant did not return any other files or records despite Mr. Tatum's almost daily requests. Eventually, Mr. Tatum took a letter to Appellant's office formally requesting his files. He

still did not received his records. The records were eventually received by a bankruptcy trustee when Appellant went into bankruptcy. Mr. Tatum never received his records.

Mr. Tatum took the computer disc with the payroll information to Mr. Robert Duncan. After reviewing the computer disc, bank statements, and payroll sheets, Mr. Duncan concluded that $415,000 was missing from Mr. Tatum's funds. Appellant did not have Mr. Tatum's permission to remove these funds from his account. Subsequently, Mr. Tatum filed a civil law suit against Appellant to recover the missing $415, 000, even though he knew that Appellant had declared bankruptcy in 2005.

Mr. Duncan stated that Mr. Tatum hired him in 2004 to lookover payroll records and money transferred out of his business account to Appellant's escrow account. With regard to the Payless Pharmacy account, each month from January 2004 to November 2004 Mr. Duncan found a discrepancy between the amount of payroll and the amount of money transferred to the escrow account. He also discovered that statements showed that on several days multiple withdrawals would be taken out of Mr. Tatum's accounts. For example, on January 21, 2004, out of five withdrawals two went to pay taxes and three went to Appellant's escrow account. Mr. Duncan concluded that with regard to the Payless Pharmacy records, the payroll totaled $467,877 and the amount transferred to the escrow account totaled $797,825.13. Mr. Duncan discovered that the records showed similar activity and transfers for the MedPlus Pharmacy. Each month from January 2004 to November 2004, Mr. Duncan found a discrepancy between the payroll amount and the amount actually transferred to Appellant's escrow account. The MedPlus Pharmacy payroll totaled $141,488.72 from January 2004 to November 2004. The amount of funds withdrawn and placed in Appellant's escrow account totaled $233,453.40. Mr. Duncan found that the total amount taken above the amount necessary for payment of payroll and taxes equaled $414,989.04.

Mr. Duncan stated that he did not have access to Appellant's escrow account when he was compiling his information. He did not know if Appellant's escrow account was just for Mr. Tatum or included other clients. He stated that it was not unusual for an accounting firm to use one escrow account for many clients. Mr. Duncan testified that the scheme to take the money out of the business account and place it in the escrow account was not elaborate. It would be easy to see the discrepancies in the account. Mr. Duncan stated that he did not know where the money went after it went into Appellant's escrow account.

Angie Pippman began working for Appellant in 2004. She had a degree in accounting. Initially, her main task was bookkeeping for another one of Appellant's clients, J. R. Gaw Produce. Later on, she handled payroll transfers to Appellant's escrow account for I-Light Technologies. Appellant and Ms. Pippman were the only employees at

Appellant's accounting firm who had the authority to transfer money into the escrow account. Ms. Pippman testified that Appellant kept all her passwords for her computer in Appellant's office that remained unlocked. There was only one password that worked for all the wire transfers for all the clients.

Ms. Pippman testified about how the escrow account was handled. She stated that to get money out of the escrow account one could either write a check or complete a direct deposit. For the checks, there was a stamp used to "sign" the payroll checks. The stamp had Appellant's name on it. The stamp was not kept under lock and key, and anyone in the office would have had access to it. For a direct deposit, the bank needed a signature showing that the individual had the authority to make a direct deposit from the escrow account.

According to Ms. Pippman, there were only six or seven people working at Appellant's office in January 2004. Appellant was not at the office very much because she was sick and was going through a divorce. Ms. Pippman stated that Appellant only maintained one escrow account to handle the business for her clients. Appellant was the only person in the office who handled Mr. Tatum's account, as far as Ms. Pippman knew. She remembered Mr. Tatum coming to the office with his concerns, and that Appellant was very upset about the visit from Mr. Tatum. After Mr. Tatum came to see Appellant about how his transactions were being handled, all of the records regarding his business including the payables, receipts, and payroll, disappeared from the computers in the office. There was no technical reason, such as the computers crashing, to explain the absence of this material.

Ms. Pippman spoke with a Tennessee Bureau of Investigation ("TBI") agent about the controversy between Appellant and Mr. Tatum. Ms. Pippman told the agent that Appellant was the only person who had access to Mr. Tatum's accounts. This was the truth to the extent of her knowledge.

Ms. Tina Luffman is a tax accountant with an accounting firm. In 2004, she worked as an intern in Appellant's office. While working for Appellant, she completed tax returns. She did not complete any on-line money transfers and did not know how they were completed. She also did not know that there was an escrow account. To Ms. Luffman's knowledge, Appellant was the only person in the office who worked on Mr. Tatum's account. At one point, Ms. Luffman volunteered to help with Mr. Tatum's account, but Appellant told her that Mr. Tatum did not like anyone other than Appellant to work on his account.

In December 2004, Ms. Luffman broke off her working relationship with Appellant. Appellant accused Ms. Luffman of taking Mr. Tatum's money. Ms. Luffman was questioned by the TBI, but the TBI never looked into her financial records.

Ms. Kim Julian also worked for Appellant. She was the senior accountant in the office. She said that Appellant was not at the office much of the time in 2004 and, therefore, was unaware what happened in the office much of the time. During the year, Ms. Julian did not complete any wire transfers because she did not know how to do wire transfers. She stated that Ms. Pippman was the only person other than Appellant who knew how to complete the wire transfers. Ms. Julian also stated that she never worked on Mr. Tatum's accounts because Appellant kept his accounts. Ms. Julian testified that Mr. Tatum's accounts were the only client accounts that Appellant kept and that Appellant was the only person with access to his accounts. After Mr. Tatum demanded his records, Ms. Julian attempted to locate them, but could not find anything, other than one bank statement, in either hard copy or in computer files. She found this to be unusual. She said that the bank statement showed that there had been seven withdrawals in one month. Ms. Julian thought this was strange because payroll occurs weekly and there should have been only four or five withdrawals.

In November 2006, the Putnam County Grand Jury indicted Appellant for one count of theft over $60,000. After a jury trial, the jury found her guilty as charged. The trial court sentenced Appellant to ten years as a Range I, standard offender. Appellant filed a timely notice of appeal.

## ANALYSIS

### Speedy Trial

Appellant argues that her right to a speedy trial was violated when the State waited seventeen months before serving Appellant with the indictment. The State argues that her rights were not violated because the delay was not unreasonable, was not due to bureaucratic negligence, and Appellant did not suffer prejudice as a result of the delay.

The United States and Tennessee Constitutions guarantee the criminal defendant the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The right to a speedy trial is also statutory in Tennessee. *See* T.C.A. § 40-14-101.

When an accused seeks the dismissal of charges based upon the denial of the constitutional right to a speedy trial, the accused must establish a period of delay that is "presumptively prejudicial." *State v. Jefferson*, 938 S.W.2d 1, 12 (Tenn. Crim. App. 1996) (citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686 (1992); *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182 (1972)). The length of the delay is dependent upon the peculiar circumstances of each case, and the delay that can be tolerated for "an ordinary street crime" is generally much less than for a serious, complex felony charge. *Barker*, 407 U.S.

at 530-31. A delay of one year or longer marks the point at which courts deem the delay unreasonable enough to trigger further inquiry. *Doggett*, 505 U.S. at 652 n.1; *Utley*, 956 S.W.2d at 494. If this threshold is crossed, a balancing test determines the merits of the speedy trial issue. In *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973), the Tennessee Supreme Court recognized and adopted the balancing test the United States Supreme Court set forth in *Barker* in which four factors must be balanced. The factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to speedy trial; and (4) the prejudice resulting from the delay. *Barker*, 407 U.S. at 530-32; *Bishop*, 493 S.W.2d at 83-84.

1. Length of Delay

The first factor under *Barker* is length of delay. In this case, the indictment was obtained on November 6, 2006, and Appellant was notified on April 4, 2008. This constitutes about a seventeen-month delay. As stated above, any delay over twelve months triggers further inquiry. *See Doggett*, 505 U.S. at 652 n.1; *Utley*, 956 S.W.2d at 494. However, seventeen months is not necessarily unreasonable compared to other cases. *See e.g., State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (concluding that a twenty-three-month delay was not inherently unreasonable); *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996) (concluding that a thirteen-year delay required further analysis of the factors and ultimately concluding that defendants were not deprived of a speedy trial).

2. Reason for the Delay

Reasons for the delay of prosecution fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in by the defense. *Wood*, 924 S.W.2d at 346-47. "The third type of delay is, by definition, justifiable and is not weighed against either party." *Id.* at 347.

We now turn to the reason for the delay in this case. Assistant District Attorney Anthony Craighead testified at the hearing on Appellant's motion to dismiss. General Craighead stated that he knew that Appellant was incarcerated in West Virginia in a federal prison at the time the indictment was obtained. When he investigated, he was told that Appellant would be released in twelve to eighteen months. He was also told that she was in a treatment program and would lose credit for good time served if he put a detainer on her at that time. General Craighead stated that if he got a detainer on her his understanding was that they would not release her from federal custody. In the event that he obtained a detainer, and she lost her credit for good time he would then have to go through the laborious process

of obtaining a writ of habeas corpus to bring her to Tennessee for an arraignment. He stated that this is a time-consuming process. Because she was scheduled to be released in about a year, he decided to serve the indictment when she was released from federal custody.

When she was released from federal prison, Appellant was placed in a supervisory program within the federal prison system. After further investigation, General Craighead learned that if he arrested her at that time, the federal authorities would place her back in prison because she was under state charges. After learning this, General Craighead decided to wait until she was released from the federal supervisory program. He determined that this would be the fastest way to obtain jurisdiction over Appellant. He came to this conclusion because if she was returned to the federal prison in West Virginia and had to serve another year, the State would not be able to prosecute her until 2009. On March 10, 2008, General Craighead sent a letter to the Federal Bureau of Prisons to inform them he needed custody of Appellant on April 7, 2008. The Federal Bureau of Prisons informed General Craighead that Appellant was scheduled to be released from federal custody on April 4, 2008. As stated above, she was informed of the indictment on April 4, 2008.

Of the four types of delay set out above, we conclude that this delay falls within the third category, a delay necessary to the fair and effective prosecution of the case. According to General Craighead, he chose to delay notification of Appellant because of the negative effect it would have on her federal sentence. He stated that based upon his discussions with federal authorities, the delay would have been even greater had he pursued extradition of Appellant immediately after the indictment was obtained. As stated above, when the delay falls within the third category, it does not weigh against either party.

## 3. Accused's Assertion of Her Right to Speedy Trial

The Tennessee and United States Supreme Courts have both recognized that "an accused who is unaware that charges are pending against him or her, as is often the case where an indictment has been sealed and not served, cannot be penalized for his or her failure to assert the speedy trial right." *Wood*, 924 S.W.2d at 351 n.13 (Tenn. 1996) (citing *Doggett*, 505 U.S. at 652-54). In the case at hand, Appellant did not know of the pending charges until April 4, 2008. Therefore, this factor does not weigh against either party.

## 4. The Prejudice Resulting from the Delay

The final factor to be reviewed in determining whether a defendant's right to a speedy trial has been violated is whether the defendant has been prejudiced due to the delay. *Wood*, 924 S.W.2d at 348; *Bishop*, 493 S.W.2d at 84. This final factor is also the most important of the four (4) balancing factors. *Wood*, 924 S.W.2d at 348. In determining this remaining

factor, we focus on (1) any undue and oppressive incarceration, (2) the anxiety accompanying a public accusation, and (3) any impairment of the defendant's ability to prepare his defense. *Bishop*, 493 S.W.2d at 85; *State v. Kolb*, 755 S.W.2d 472, 475 (Tenn. Crim. App. 1988). In applying the third of these considerations, the impairment of defense, the Tennessee Supreme Court and the United States Supreme Court have acknowledged:

> [I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown . . . . [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of the delay.

*Wood*, 924 S.W.2d at 348 (citing *Doggett*, 505 U.S. at 655) (citations omitted).

We conclude that there was no undue and oppressive incarceration or anxiety accompanying a public accusation. However, we must analyze the third factor. In her argument, Appellant focuses on the impairment of her ability to put on a defense as the basis for asking the court to find in her favor with regard to this factor. At the hearing on her motion to dismiss, Appellant testified that after Mr. Tatum spoke with her about problems with her account in November 2004, she looked into the matter and found duplicate entries. She herself performed an audit on his account. According to Appellant she generated audit papers and activity logs, which showed who was logging into her office computers at a certain time and whether it was occurring in the office or remotely. Her lawyer also hired a private investigator, Mike Galligan. Appellant stated that the investigation showed that Ms. Luffman was the culprit. Appellant stated that Mike Galligan discovered that Ms. Luffman had seven aliases.

In 2005, Appellant declared bankruptcy. The bankruptcy trustee took control of all her assets and everything in her office without warning. She was unable to retrieve her files. Her bankruptcy attorney tried to get Appellant's computers but was unsuccessful. The bankruptcy was discharged on January 18, 2008. All Appellant's books and records were destroyed by the bankruptcy trustee. According to Appellant's father, Alfred Middlebrook, who was listed as a creditor in the bankruptcy, he received a notice from the bankruptcy trustee on February 22, 2008, stating that Appellant's records would be destroyed within thirty days if not claimed. Mr. Middlebrook did not claim the records. Appellant argues that

the loss of these records was a result of the delay in prosecution and, therefore, her ability to show that someone else was responsible for the theft through these records was impaired.

In its ruling regarding Appellant's motion to dismiss, the trial court stated that this factor was the most important in the case at hand. The trial court determined that the information presented at the hearing and in briefs subsequently filed by both sides was not sufficient to prove that there was indeed prejudice so that the case should be dismissed.

We agree with the trial court. The sole source of information regarding the documents in question is Appellant. She was the only person who testified regarding the existence of these documents. Appellant did not present her attorney or Mike Galligan to testify about the investigation following Mr. Tatum's complaints. Even if they did not have copies of the documents, they surely could have testified as to the existence of the documents. In addition, at trial, Ms. Pippman and Ms. Julian testified that shortly after Mr. Tatum came to complain about his account, all of his records disappeared from the office in both hard copies and electronic copies. We conclude that prejudice has not been show under the facts at hand. This factor weighs in favor of the State.

When weighing all four factors, the balance of the factors weighs in favor of the State. Therefore, we conclude that the trial court did not err in denying Appellant's motion to dismiss.

## Sufficiency

Appellant also argues that the evidence was insufficient to support the conclusion that she was the perpetrator of the theft. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences

that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Theft is defined as the following, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. "Theft of property or services is: . . . (5) A Class B felony if the value of the property or services obtained is sixty thousand dollars ($60,000) or more." T.C.A. § 39-14-105(5).

When the evidence is taken in a light most favorable to the State, the evidence is sufficient to support Appellant's conviction. Mr. Tatum was a client of Appellant. Appellant was in charge of completing Mr. Tatum's payroll and had the ability to transfer money from his business accounts to her firm's escrow accounts. Mr. Tatum was informed by the bank that his account balance was considerably less than he thought. After hiring an independent accountant, Mr. Tatum discovered that there was over $415,000 missing from his account. The evidence showed that several withdrawals were being made from Mr. Tatum's account and being placed into Appellant's escrow account.

Clearly, these elements meet the requirements to prove theft of over $60,000. There is no direct evidence to show that Appellant stole the money. However, three individuals testified that only Appellant worked on Mr. Tatum's account. This constitutes circumstantial evidence that Appellant was the only individual with access to Mr. Tatum's funds and, therefore, the person responsible for the theft. As stated above, we cannot substitute our own judgment for the jury's judgment regarding the inferences drawn from circumstantial evidence. Therefore, we conclude that the evidence was sufficient to support Appellant's conviction.

This issue is without merit.

### State's Motion to Take Judicial Notice or Supplement the Record

In addition, we must address a motion filed by the State in this Court six days before oral argument. In its motion, the State asked this Court to take judicial notice or supplement

the record on appeal with records from the bankruptcy court regarding Appellant's notification of the impending destruction of her records. Because Appellant did not have the ten days to respond, as set out in Rule 22(a) of the Tennessee Rules of Appellate Procedure, we include our ruling on the motion in this opinion.

The State requested this Court take judicial notice of the filings in the bankruptcy court because they are public record. A court can take judicial notice of a "fact . . . not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). An appellate court may take judicial notice at any time during a proceeding. *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009). However, generally speaking, our courts have taken judicial notice of pleadings and filings that have occurred in an earlier proceeding involving the same defendant in our state courts. *See id.* "Facts relating to the operation of the courts, matter occurring within the intermediate trial or appeal, or developments in a prior trial or prior proceedings all have been subject to judicial notice." *Id.* "Those matters pertaining to the records of a court are subject to judicial notice by the judge of that court." *Id.* at 870. The documents from the bankruptcy court are from a separate court and do not constitute an earlier proceedings concerning the criminal charges at hand. Therefore, we chose not to take judicial notice of the documents submitted by the State.

With regard to the State's request to supplement the record, we deny the request. The bankruptcy records submitted by the State were not submitted to the trial court. Therefore, the records were not considered by the trial court when making its decision. Rule 24(g) of the Tennessee Rules of Appellate Procedure states the following:

> **Limit on Authority to Add or Subtract From the Record.** Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of *what transpired in the trial court* with respect to those issues that are the bases of appeal.

(emphasis added). Clearly, the documents from the bankruptcy court do not convey what occurred in the trial court regarding Appellant's motion to dismiss or the sufficiency of the evidence to support her conviction.

For the reasons stated above, we deny the State's motion to take judicial notice or supplement the record on appeal.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment of the trial court.


_____
JERRY L. SMITH, JUDGE